# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
### October 8, 2024 Session

## STATE OF TENNESSEE v. MENDY POWELL NEAL

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2014-CR-620    Larry J. Wallace, Judge**

_____

### No. M2023-01176-CCA-R3-CD

_____

After three days of a Dickson County jury trial, the Defendant, Mendy Powell Neal, who was charged with the first degree premeditated and felony murder of her husband and the aggravated arson of their home, entered a *North Carolina v. Alford*, 400 U.S. 25, 37 (1970), best interest plea to voluntary manslaughter, a Class C felony, in exchange for the dismissal of the felony murder and aggravated arson counts of the presentment and an agreed range of three to four years, with the trial court to determine the length and manner of service of the sentence. At the conclusion of the sentencing hearing, the trial court denied the Defendant's request for judicial diversion, determined that she was not a suitable candidate for probation or other alternative sentencing, and sentenced her as a Range I, standard offender to four years at 30% in the Tennessee Department of Correction. Following the denial of what the Defendant styled as a "Motion for New Trial," which the trial court treated as a Rule 35 motion for a reduction in sentence, the Defendant filed an untimely appeal to this court in which she argues that the trial court erred in both the length and manner of service of the sentence. Based on our review, we conclude that the interest of justice does not warrant that the timely notice of appeal requirement be waived for the Defendant's attempt to appeal the trial court's original sentencing determinations. We further conclude that the trial court acted within its discretion by declining to reduce or modify the sentence pursuant to Rule 35 of the Tennessee Rules of Criminal Procedure. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT W. WEDEMEYER, J., joined.

F. Lee Spratt, Charlotte, Tennessee (on appeal and at trial and sentencing), and Olin J. Baker, Charlotte, Tennessee (at sentencing), for the appellant, Mendy Powell Neal.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Ray Crouch, District Attorney General; and Dani Bryson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In the early morning hours of July 11, 2012, the Defendant's husband, Matthew Neal, died in a house fire that totally consumed the couple's Charlotte log home. The Defendant escaped without any apparent injury, and her two minor children were at a sleepover with a friend. The victim's autopsy revealed that the victim had alcohol and sedatives in his system and died from carbon monoxide toxicity and thermal injury. Investigators' suspicions were immediately raised by the Defendant's demeanor and behavior after the fire, and they subsequently uncovered evidence that led them to believe that the Defendant intentionally set the fire to kill the victim. On December 8, 2014, the Dickson County Grand Jury returned a presentment charging the Defendant with the first degree premeditated murder of the victim, the first degree felony murder of the victim during the perpetration of an aggravated arson, and the aggravated arson of the home.

The Defendant proceeded to a jury trial on those charges on May 16, 2022. During the three days of proof before the Defendant's May 19, 2022 entry of her best interest guilty plea, the State called nineteen witnesses, including the victim's and the Defendant's neighbors, law enforcement officers and detectives, firefighters, the victim's sister, the Defendant's sister, the Defendant's hairdresser, and the Defendant's coworkers and friends. Through these and other witnesses, the State presented evidence that the victim had been laid off from his job in December 2011, and that the couple was experiencing financial hardship, with the victim's family providing thousands of dollars of financial assistance in the months preceding the victim's death. The victim had recently had a heart attack, suffered from high blood pressure, smoked, and drank alcohol. The Defendant handled the victim's prescription medications by dispensing his pills to him each day.

On July 10, 2012, the Defendant asked a coworker if the coworker knew where she could get "roofies." She also asked her hairdresser if she knew where she could obtain valium or Xanax. That same night, the Defendant's friend, January Shelton, saw the Defendant forcing the victim to take some pills. At the time, the victim was seated in a chair near the home's front door, had slurred speech, and appeared intoxicated.

At 2:18 a.m. the next morning, the Defendant called 9-1-1 to report the fire. A short time later, the Defendant knocked on the door of her neighbors, Beatriz and Edward Swan, to tell them that her house was on fire. Mrs. Swan noted that the Defendant was wearing

her shoes, and that only the rear deck portion of the house appeared to be on fire at that time. She said the Defendant sat down to smoke a cigarette and did not call for the victim until Mrs. Swan's husband ran to the home and began calling the victim's name.

Mr. Swan and a responding deputy, who could hear the victim moaning on the other side of the closed front door, attempted to enter the home but were unable due to the intensity of the fire. The next day, the victim's burned body was found within ten feet of the front door. The victim was burned over 95% of his body and died of carbon monoxide toxicity and thermal injury. His blood alcohol content was .169, and the following drugs were found in his blood: alprazolam, also known as Xanax; carisoprodol, a muscle relaxer commonly known as Soma; and oxcarbazepine, an antiepileptic drug that causes psychomotor impairment, which had been prescribed to the victim for jaw pain.

The Defendant appeared calm, uninjured, and clean when interviewed by a detective on the night of the fire. She reported to the detective that she had awakened to find the house on fire, had run downstairs to attempt to rouse the victim, and then run outside to a tree. She said that she looked back, saw that the victim was not behind her, and then called 911. When the detective asked her if the victim drank, the Defendant "smirked" and replied, "like a fish."

In a conversation with the victim's sister that same day, the Defendant said that she had gotten their belongings out of the house per their fire safety plan but had not gotten the victim out. The Defendant also talked about whether she would receive the victim's $100,000 life insurance policy proceeds, and on the morning after the fire began preparing an inventory list of lost items for their homeowner's insurance policy.

On the day of the victim's funeral, the victim's hairdresser asked if the Defendant needed any makeup or clothes. The Defendant responded that she had packed a bag with her makeup and clothing and placed it in her vehicle on the night before the fire. The Defendant's sister, who was with the Defendant at the hair salon at that time, saw a ziplock bag of jewelry in the Defendant's purse. The Defendant had no explanation for how the bag of jewelry had gotten in the purse.

The Defendant and her children stayed with Ms. Shelton for several months after the fire. On the Wednesday before Thanksgiving, the Defendant confessed to Ms. Shelton that she had intentionally set the fire and left the victim inside the burning house. Ms. Shelton told the Defendant that she needed to be gone from her home by the time Ms. Shelton returned from a trip. When Ms. Shelton returned home, the Defendant had moved into a house with the Defendant's boyfriend, leaving the urn with the victim's ashes behind in Ms. Shelton's home.

At the April 17, 2023 sentencing hearing, Tennessee Department of Correction ("TDOC") Probation Officer Wendy Gale James-Hughey, who prepared the Defendant's presentence report, testified that she had a long conversation with the Defendant, but the Defendant did not tell her anything different from the statement she provided for the report, which read: "My house caught fire and my husband was inside and was killed. I tried to get him out but wasn't able." She said the Defendant did not elaborate on how she tried to get the victim out of the house.

On cross-examination, Officer James-Hughey testified that she did not find any prior criminal charges or convictions in the Defendant's background, and that the Defendant scored as low risk on the STRONG-R assessment, indicating that she was not likely to reoffend. On redirect examination, she recalled having seen that the Defendant had been charged with multiple counts of altering a prescription. She said she did not include that information in the presentence report because those charges had been dismissed. She was unaware if the dismissal of those charges occurred as part of the Defendant's plea deal in the instant case.

Detective Chris Stockman of the Dickson County Sheriff's Office testified that he was contacted shortly after 2:30 a.m. on July 11, 2012, about the fire, which "was a complete loss." He said he spoke with the Defendant at the scene that morning, and the next day, July 12, he and Agent Amy Lamping with Tennessee Bomb and Arson called the Defendant to the office for a "standard follow-up interview." When the Defendant arrived, she did not appear to Detective Stockman as someone who had just lost everything in a house fire because she was "very well dressed, put together, [with] jewelry, that type of thing." Detective Stockman stated that the victim's autopsy and drug panels revealed that the victim died from smoke inhalation and thermal injury from the fire, that he had a blood alcohol level of .16, and that there were therapeutic levels of prescription drugs in his system.

Detective Stockman testified that the Defendant's July 12 interview "raised a level of suspicion" with him and Agent Lamping. He stated that Agent Lamping applied for a search warrant for the Defendant's cell phone records, which they received sometime late in September of that year. During the July 12 interview, the Defendant told them that she had gone to bed at 10:10 p.m. on July 10 and been awakened to the fire on July 11 when her cat jumped on her. The Defendant's cell phone records, however, showed that she had called and texted her friend January Shelton in the early morning hours of January 11 before reporting the fire. Detective Stockman testified that the Defendant made a three-second call to Ms. Shelton at 1:32 a.m., made a four-second call to Ms. Shelton at 1:33 a.m., texted Ms. Shelton at 1:36 a.m. and again at 1:42 a.m., called Ms. Shelton at 1:43 a.m., and called 9-1-1 at 2:18 a.m. He said that when they confronted the Defendant at an October 1 interview with those early morning calls and text messages, the Defendant

- 4 -

"became very defensive and . . . said that she had a history of calling people in her sleep, things of that nature." He stated that when he observed her in the back of an ambulance on the night of the fire, she did not appear drowsy.

On cross-examination, Detective Stockman acknowledged that the toxicologist testified at trial that an individual on Ambien could engage in various activities, including sexual intercourse, without any awareness or memory of it. He said he interviewed Amber Fleet in 2012 and recalled that she testified at trial about "things that [he] was not aware of during the time of the investigation." Although he could not recall Ms. Fleet's specific trial testimony, he agreed it could have been that she had showed him text messages in which the Defendant asked her for Xanax and similar drugs. He stated that he never looked at Ms. Fleet's cell phone and was unaware of any text messages when he interviewed her.

Detective Stockman acknowledged having testified at trial that "a command decision" was made to use heavy equipment at the home. He explained that because the still-standing portion of the home was in very poor condition, they decided that the scene had to be made safe before anyone entered to search for the victim. He conceded that the insurance company paid a claim on the home to the Defendant, and that the insurance company presumably investigated the fire before paying the claim. When asked if the insurance company's conclusion that the use of heavy equipment prevented them from determining the cause of the fire also meant that it was impossible to determine if the fire was the result of arson, he replied that it would be difficult to make an arson determination, but that he was not a fire investigator. He then agreed that Agent Lamping was a fire investigator, and that she and her supervisor had been involved in the decision to bring in the heavy equipment.

Detective Stockman acknowledged that Ms. Shelton was interviewed several times. He was aware that she was facing some felony prescription fraud charges at the time of those interviews but said he had no direct involvement with that case, which was being investigated by the drug task force. He acknowledged that in a 2015 interview, Ms. Shelton characterized her prescription fraud charges as pending based on the case involving the Defendant.

On redirect examination, Detective Stockman testified that, to his knowledge, the Defendant's insurance company did not have access to the Defendant's phone records during their investigation of the fire. On recross-examination, he testified that Agent Lamping was the one who dealt exclusively with the insurance company and conceded that he had no knowledge of whether she told the insurance investigators about the Defendant's phone records.

Upon questioning by the trial court, Detective Stockman described his interview with the Defendant in the back of the ambulance on the night of the fire as "just a strange contact[,]" testifying that although the Defendant appeared sad, she was not crying. He said he did not notice the Defendant wearing any jewelry that night but recalled that she later mentioned that she had slept in her jewelry on the night of the fire. He stated that the Defendant told him she had a history of both calling and texting people in her sleep but nothing in her phone records was consistent with that type of behavior, which "appeared to be localized to that one incident, that one night." Upon further recross examination, Detective Stockman testified that his understanding was that the Defendant was wearing clothing donated by her church during the July 12 interview.

The Defendant's first witness at the sentencing hearing was TDOC Probation and Parole Officer Austin Frye, who had supervised the Defendant since the trial. Officer Frye testified that the Defendant had complied with all his requests, had not failed any drug screens, and had reported on schedule, showing responsibility and accountability.

Wendy Mena testified that she was Chief of Staff at Western Express Trucking Company and since 2014 had managed the department in which the Defendant worked. She described the Defendant as "the hardest working person" she knew, estimating that the Defendant handled three times the workload of other employees in her department. She stated that she had never had any behavioral issues with the Defendant, and that the Defendant always maintained her professionalism, despite being ridiculed at work over the instant case. Ms. Mena testified that she was aware of the outcome of the trial, and that it did not change her opinion of the Defendant, whom she described as a "very giving" and caring person.

On cross-examination, Ms. Mena testified that she had worked for Western Express Trucking Company for twenty-five years but did not become acquainted with the Defendant until 2014 when she began managing her department. She acknowledged that she could not give any assessment of the Defendant's interactions with her coworkers prior to 2014, and that she knew nothing of the Defendant's and the victim's relationship or financial status in 2012.

Twenty-two-year-old Alicia Nikole Bailey, the victim's older daughter, testified that her father was not active in her life, and that the Defendant had been her and her sister's "sole provider" and "only guardian[.]" She said that they were very active in church when she was growing up, that she had never been in any trouble, and that she currently worked for Western Express Trucking Company, the same company that employed the Defendant. She described the Defendant as her best friend and said that she still lived at home and did not know what she would do without the Defendant.

Eighteen-year-old Lillian Joyce McKenzie, the Defendant's younger daughter, testified that she was a high school senior, that she had dyslexia, and that the Defendant had helped her get the extra classes she needed to deal with her condition. She said her father was not involved in her life, and that the Defendant was her only parent and the one who took her to all her school and church activities. She stated that she lived at home with the Defendant, that she was very active in her church, and that she had never been in any trouble. She said that, for the past year and a half, the Defendant had also provided a home for one of her friends whose home living situation was not good and who had nowhere to go. She testified that she would not know what to do if the Defendant was gone.

Keri Smith testified that she and the Defendant developed a friendship through their mutual involvement in the Compassion Church in Dickson. She stated that the Defendant was a person with "a big heart" who was helpful in the community and "just loving and kind[.]" She said she attended the Defendant's 2022 trial, and that it did not affect how she felt about the Defendant. During the time she had known her, she had observed nothing about the Defendant that would make her question her perception of the Defendant as a loving, compassionate person. On cross-examination, she testified that she met the Defendant in 2017 or 2018 and had no personal knowledge of her prior to that time.

Matthew Wade testified that he was a marriage and family therapist and had known the Defendant in a professional capacity for approximately one year. He said that the Defendant did not have any clinical diagnoses, but that he had provided her with weekly therapy to help her deal with the deep loss she had experienced. He stated that when the Defendant arrived for her first appointment, he immediately saw that she "was in a heavy grieving process." He explained that the grieving process is cyclical, that grief never ends, and that it "kind of bounces all over the place in our minds." He said that grief and remorse were two different things, with remorse "speak[ing] to 'I've done something wrong.'" During the year he had treated the Defendant, she demonstrated grief, not remorse.

At the conclusion of the hearing, the trial court reviewed at length both the trial and sentencing hearing testimony before addressing the State's and the Defendant's proposed enhancement and mitigating factors. The trial court found that the Defendant's lack of a criminal history was an applicable mitigating factor. *See* Tenn. Code Ann. § 40-35-113(13). The trial court found as applicable enhancement factors that the victim was particularly vulnerable because of age or physical or mental disability, that the Defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense, that the amount of property damage of the victim was particularly great, that the Defendant had no hesitation about committing the crime when the risk to human life was high, and that the Defendant abused a position of private trust that significantly facilitated the commission of the offense. *See id.* at § 40-35-114 (4),(5),(6),(10),(14).

The trial court then addressed the Defendant's request for judicial diversion, considering and weighing each of the appropriate factors before concluding that the horrific circumstances of the offense and the need for deterrence, both of which weighed heavily against the grant of judicial diversion, outweighed the factors in the Defendant's favor, which were her lack of a criminal history, her amenability to correction, and her social history.

Based on its weighing of the applicable mitigating and enhancement factors, the trial court sentenced the Defendant as a Range I, standard offender to a term of four years. The trial court found that the Defendant was not a suitable candidate for probation or other alternative sentencing and that a sentence of confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to the Defendant. The trial court's ruling states in pertinent part:

> Of course, I cited in the record along with the testimony the Court found credible. I'm not going to recite it all, but suffice to say, the Court finds that the conduct was horrifying, shocking, reprehensible, and offensive. That you leave your husband in there to burn up and die.

> And I'll be plain. [Defendant], you may have changed. I'm not sure. I don't think you have. But regardless, though, you know, I know what you did. I believe it. I saw all the circumstantial proof, and I can't - - you know, just one of the worst crimes leaving your husband to burn up to death. And, of course, you saw the exhibit.

> So the Court finds that probation should be denied entirely. She's to serve her sentence in the Department of Correction[].

On May 8, 2023, the trial court entered the judgment. On May 17, 2023, the Defendant filed what she styled as a "Motion for New Trial" in which she argued that the trial court erred in sentencing her to the maximum term within the agreed range, in not granting her request for judicial diversion, and in not granting an alternative sentence. The trial court treated the motion as a Rule 35 motion for reduction of sentence, and on July 18, 2023, entered an order denying the motion. The trial court found that sentencing the Defendant to the maximum length in the Tennessee Department of Correction "was the just and proper sentence due to the Defendant's misrepresentation and dishonesty as well as the overwhelming circumstantial proof of Defendant's conniving and forethought regarding the crime." The trial court further found that Defendant "received a fair sentencing hearing" and that "the interests of justice would not be served by [the] Defendant receiving an alternative sentence[.]" Finally, in expressing its satisfaction with its denial of judicial diversion, the trial court again noted, among other things, the

"overwhelming circumstantial proof of [the] Defendant's conniving and forethought regarding [the] crime[,]" and the fact that the Defendant "had ample opportunity and proximity . . . to save the victim from an utterly horrific death."

On August 17, 2023, the Defendant filed a notice of appeal to this court.

## ANALYSIS

On appeal, the Defendant contends that the trial court erred in sentencing her to the maximum sentence within the agreed upon range and in denying her request for judicial diversion or alternative sentencing. Among other things, the Defendant takes issue with the trial court's credibility findings and argues that the trial court misapplied enhancement factors and failed to appropriately weigh the proof at sentencing of the Defendant's compliance with the conditions of release, her work history and ethic, her parenting of her daughters, and her efforts at grief counseling. The Defendant further argues that a manslaughter conviction is insufficient to support the trial court's finding that the circumstances of the offense were especially violent, horrifying and shocking. The State responds by arguing, among other things, that the appeal should be dismissed because the Defendant's notice of appeal was untimely.

In her reply brief, the Defendant concedes that she failed to file her notice of appeal within thirty days of the entry of the judgment but argues that this court should consider her sentencing issues on their merit because she raises the same issues on appeal that she raised in her "Motion for New Trial," which the trial court treated as a Rule 35 motion for reduction of sentence, and her notice of appeal was filed "on August 17, 2023, within thirty (30) days of the entry" of the trial court's order denying the Rule 35 motion. In the alternative, the Defendant argues that this court should waive the timely notice of appeal requirement in the interest of justice. In support, she asserts that the trial court "relied almost exclusively on the State's proof at trial at sentencing and considered almost no proof offered by either side at the sentencing hearing." She then cites the delay caused by her motion for "the trial court to allow proof of her case-in-chief from trial to be heard and added to the record," the delay in the record on appeal being certified to this court, and the delay caused by the State's multiple requests for extensions for filing its brief in the case.

This court may waive the timely filing of a notice of appeal "in the interest of justice." *See* Tenn. R. App. P. 4(a) ("[I]n all criminal cases the 'notice of appeal' document is not jurisdictional, and the timely filing of such document may be waived in the interest of justice."). When considering whether to waive an untimely notice of appeal, "this court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular

case." *State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007). The appealing party "bears the responsibility to properly perfect his [or her] appeal or to demonstrate that the 'interests of justice' merit waiver of an untimely filed notice of appeal." *State v. Thomas*, No. W2022-00109-CCA-R3-CD, 2023 WL 328337, at *3 (Tenn. Crim. App. Jan. 20, 2023), *perm. app. denied* (Tenn. June 7, 2023). As we have observed, "[w]aiver is not automatic," and "[i]f this court were to summarily grant a waiver whenever confronted with untimely notices, the thirty-day requirement of Tennessee Rule of Appellate Procedure 4(a) would be rendered a legal fiction." *Rockwell*, 280 S.W.3d at 214.

We conclude that there is nothing that warrants that we waive the timely notice of appeal requirement with respect to the trial court's original sentencing determinations. The Defendant was represented by counsel and received a full sentencing hearing. Moreover, the trial court issued extensive, detailed findings in support of its sentencing determinations, which are supported by the record.

We further conclude that the trial court acted well within its discretion in declining to reduce or modify the Defendant's sentence pursuant to Rule 35 of the Tennessee Rules of Criminal Procedure. Rule 35 provides that "the trial court may reduce a sentence upon motion filed within 120 days after the date the sentence is imposed, or probation is revoked." Tenn. R. Crim. P. 35(a). "The intent of [Rule 35] is to allow modification only in circumstances where an alteration of the sentence may be proper in the interests of justice." Tenn. R. Crim. P. 35, advisory comm'n cmts. "The standard of review in an appeal from a trial court's decision on a Rule 35 motion is whether the trial court abused its discretion." *State v. Patterson*, 564 S.W.3d 423, 429 (Tenn. 2018). In declining to reduce or modify the sentence, the trial court entered a thorough and extensive order in which it reviewed the evidence, including the horrific manner of the victim's death, before affirming its original sentencing determinations. The Defendant has not shown any circumstances, warranting the alteration of her sentence in the interest of justice.

## CONCLUSION

Based on our review, we conclude that the interest of justice does not warrant that we waive the timely notice of appeal requirement for the trial court's original sentencing determinations, and that the trial court acted within its discretion in declining to reduce or modify the Defendant's sentence. Accordingly, we affirm the judgment of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE